And after you catch your breath, we will call the next case, which is also Team Worldwide v. Intex Recreation, 2022-18-16. And if you are ready again, Mr. Hopkins, you'll hear from us. Thank you, Your Honor. So, in the 018 patent, this chafee is not art to the 018 patent. Perrienti was used in conjunction with this idea that you might want to recess the pump body into the bed in light of art that dates back to the 1800s. That's the obviousness, the mandate from the court to go back to the Patent and Trial Appeal Board to find out, if taking a holistic view, if it would be obvious or not in light of secondary considerations. Wasn't there a finding that your products don't practice any of the claims, and so that destroys your argument of secondary considerations? So, there was a finding that they found that the proof that was supplied, they didn't credit the proof for Team Worldwide's own products because they felt like the proof was lacking. That is, that it was inconsistent in their minds with this concept of mixing and matching that they said. And that doesn't destroy secondary considerations because what's not, and I will address that, but what's not at issue is that all of the products that were accused in the Walmart case, all the Intex products, the Best Way products, many products, they actually filed a stipulation. I mean, this almost never happens in a litigation. They filed a stipulation that did practice the 018 patent claims. Can I just ask you about this? My recollection is that the board, and this may not ultimately matter, but in the discussion of presumption in Texas, said you get a presumption because there's infringement. That's flatly incorrect and impossible. It also has to be coextensive. A smartphone has 100,000 features and if it could infringe a patent on a single one, you would not get a presumption of nexus. And I didn't see any discussion of coextensiveness. Why is there a presumption at all? The infringement that is here goes to the overall design of the airbed. So, it's the same reason why we're back to the appellate court a second time, which is the design here is not a complicated design. And it is not about a particular sub-feature of the airbed. I mean, what you're talking about is... Your own products, I assume, were fairly successful. And they practiced the patent and we submitted evidence of that. Right, but I thought there was a finding that there was not proof that they practiced the patent. This is one of the errors I'm here to talk to your honors about. What about the coextensiveness issue? Your expert, I think, uses the word, but there's no analysis of whether it's coextensive. And the word found that there are these other features that are important to consumers. And there's no analysis as to what other features might be present in these things which would make them not coextensive with the patent. So, your honors, the board was right that there should be a presumption of nexus here. And what happens is the design... I can't answer my question. I'm sorry. There's no evidence of coextensiveness. There is evidence of coextensiveness. It's in the declarations that were filed by Dr. Stevick, who is the technical expert. He uses the word, if I recall correctly, but there's no analysis. The analysis that he provides is that he does the workup of what the whole product embodies. So, he says every one of these airbeds is a bladder with a valve that you have a pump. Where does he analyze the coextensiveness requirement and say there aren't other significant features in the device that would affect coextensiveness? Because there's what came before that's the non-built-in pump airbed that is recognized that he looked at. And then there's what came after, which is the built-in pump airbed that practices the O&A. I don't think you're addressing my question. Well, that's what proves coextensiveness, Your Honor. The idea that you can take a before and after picture and say I've got the thing that's before. Everybody can buy that. And the thing that's different about the thing that comes after, the B version. I don't think that's coextensiveness. It may be a really good case for nexus, but not coextensiveness, which is why I'm not sure that coextensiveness matters. I see. Coextensiveness here would require looking at how nice the cushions are on the mattress, how colorful they are. All of the features in the list of things that consumers want and say there's a lot more in this product than just a particular way of putting the pump in the mattress. That doesn't sound like it actually is coextensive, but again, maybe it doesn't matter. Well, with the time I have, I understand Your Honor's point. What I can say about it is there was a finding that consumers also look to things when they buy airbeds, and some consumers buy airbeds that aren't built-in pump airbeds. So there was a discussion of comfort and durability. And if Your Honor's find that that's not nexus but it is proof of secondary considerations, I would posit to you that if the claims speak to the entirety of the design of the bed, that is the bed with the built-in pump. That is how the claim is framed. You can't just have one part or the other. It's the whole bed that is claimed with this specific design, and that's what was found to infringe versus the ones that don't have the built-in pump. Beyond that, I don't have another argument on this. So that's where I'll have to rest on that point. But what I will say in furtherance of this is, and with the time I have, is that this idea of comfort and durability, we think is a red herring. Because everybody, these are nonce words, right? These are just advertising things you say. Every airbed in the marketplace will tell you that it's comfortable and durable. And every single airbed says it. So it's not a matter of which consumer preference. Every single airbag does not have common features of comfort and durability. They vary from air mattress to air mattress. But you will get counterpart beds. So if you have something that's a comfortable, deep airbed, there will be a version without a pump, and there will be a version with the built-in pump. The version with the built-in pump will have pillow top or whatever it is, whatever is advertised, and they're sitting on the shelf. And we actually cite in 9888 and 9889 in the record some evidence from the petitioners where they had their own buyer who said people are going into Walmart and they're looking for the built-in pump airbeds. And when they go and they find all the things you're talking about, but there's no built-in pump airbeds, they are leaving the stores and we're facing serious sales decline because they want the built-in pump airbeds. You need to put them back in the part of the store where people with the other airbeds. Do you happen to have at hand a citation for what the best evidence is that basically all the pump in beds and the pump outside the beds have otherwise common features or same features? Right. And so I think that this is discussed. Excuse me. The patented versus non-patent is discussed in the blue brief at 3334. It's found at 12130 and 12139. Just give us the best ones so we can look at it. I just have those two pages together. It might be 12130 through 139 and I can go grab those if necessary. It's in my notes. What's the site? Excuse me. Let me share that. So the 12130 is the market report where what happened is there was a third party that did an analysis of the entire market of airbeds and was able to find that you had basically all the features in all the airbeds and compared the sales of built-in pump to non-built-in pump airbeds. And at 12139 shows that the sales of the built-in pumps started overtaking the built-in airbeds. That's not quite the point. And then I know that Dr. Becker did his analysis and he has a table where he has a declaration that he filed in the case. And I'm looking at the blue brief at page 30. I will have to come back to that. I do think that we have this. What I would say is we have several things. We have an arbitration decision that shows in this case that there was a value tied directly only to this after taking out comfort and durability. That was an amount that we've given to your honors. That was like a number that's dollars per bed that isolated the value of this and found at 22841 after going through a whole process that you could find that out of any airbed there was significant value. Every single sale had significant value tied only to the patented issue. And so that would be another example of that because it already accounts for comfort and durability and all the arguments that was made. And nevertheless found independent value in every single airbed that was tied only to these inventions. And that's how the royalty rate was established in this case. So we have that. We have a stipulation of a huge amount of sales. I think overall. And just context was party to that. Yes. Yes. And then we think the board made a couple of other errors. One of the other errors is that they're not crediting. They're asking for market share but they're not crediting dollar amounts. If you've got sales that may exceed a billion dollars in a marketplace we all live in. In the Panduit case on remand at 810 F second 1571 to 72. Fifty million dollars a year irrespective of market share was considered one of the best secondary considerations cases ever made. And you're talking about more than a billion dollars over an eight year period is far in excess of that. And so to the extent we cite the Keymore's case to the extent that that's not being credited because there's not specific market share data. That's contradicted by the 121330 through 12139 and by the fact Keymore says you don't need it.  And the other thing that is an error that we need to bring the court's attention to is when this case went back. The what's supposed to happen is you're supposed to start the analysis and do a holistic analysis here. And what actually happened is they went back with the remand from the court and they never withdrew the problems that they said Perrienti had and why you would not build the pump into the bed as to find out how strong or weak the case is. Granted they said it's close enough. If you don't have secondary considerations we're going to have to find it invalid. But they reclassified what was so weak of a case that three to zero the first time around they held it to be valid that even without secondary considerations. You're trying to say we got it wrong. No what I'm trying to say Your Honor is that when you assess the strength of the prior art in the secondary considerations the panel may have gotten it right. Well Your Honor I respectfully think the panel did get it wrong. But what I'm going to say is assuming the panel got it right because we're not on appeal about that. That doesn't mean it was a strong case. Nothing in the remand or the decisions said it was a strong case just that without secondary considerations it was enough. Can I ask. I had thought that while individual secondary considerations were objective and issue involved factual determinations. And I think we've even said that the individual assessment of the weight of the evidence for a particular objective and issue is a fact question. That the overall assessment call it weighing although that becomes a confusing word here. The overall assessment of obviousness considering the prior art portion of the analysis and the secondary considerations is a legal matter for us not for the fact finder. That is correct Your Honor. That is correct. And what happened in rape. So we can assess for ourselves how strong we think the prior art analysis is. And that strength then we can assess for ourselves what effect it has on the overall consider everything right analysis. That is correct Your Honor. And then I just want to point out that the flaw in the way the board. I see that Your Honor. The flaw is shown in that Volvo Penta case that I just said 2023 US App Lexus 22303. Where when the board started saying it was going to give some weight to this category and some weight to that category but didn't define it. It was reversed saying that that's not enough of an analysis to actually determine what's going on. And I call it the one plus one plus one plus one equals one or less than one. You didn't make that argument in your briefs right. I think well the Volvo case just came out in August of this year. I understand. But what we said was. They made the argument you didn't. Well Your Honors I think that we made the argument that actually that the board didn't treat the overall secondary considerations correctly because it didn't provide the total weight that it should to the analysis. What it said it said over and over again. We'll give this some but not considerable weight. We'll afford some weight. Well this will give little weight. The only thing they gave no weight to was near simultaneous invention. They gave no weight to that. But they gave weight to six categories that we provided evidence like a massive amount of evidence of secondary considerations. More than a billion dollars of sales. And Dr. Stevick did in fact do an analysis with these easy pump five and found that the team worldwide products did practice going through an analysis and it just wasn't credited. But these are errors. That should be correct. We'll give you two minutes for a vote. But let's hear from the other side. Mr. McCoy. Thank you Your Honors. May it please the court. Andrew McCoy on behalf of Petitioner Intex and Applee Intex. The board's decision should be affirmed. There was substantial evidence to support every single fact finding that the board made on every single secondary consideration that it analyzed. Not all of which are on appeal. Only some of them. But every single secondary consideration that this board looked at, they analyzed the evidence that TWW put in the record, which was sparse in many respects. They analyzed Petitioner's rebuttal evidence and they reached the correct finding. Do you think that there is evidence that there are products that come in versions with the pump outside and the pump inside that are otherwise identical? And I appreciate you asking that question multiple times today, Your Honor. And no, that evidence is not in the record. There is no apples to apples comparison to say, here's a product that has the exact same feature set as this product. Or even, forget about exact, but similar. There's nothing that says similar feature set, similar feature set, except for the pump and here's the comparison in success. That's not in the record. Dr. Becker never performed that analysis. Do you agree or not agree that there could be a quite significant, powerful case of commercial success, even with capturing less than 50% of a market? That there turns out to be 45% of people looking for air beds are willing to pay more for the bed with a particular feature. It is a very fact-intensive analysis. Absolutely, Your Honor. That would suggest that there was a market demand that, if it were obvious, would have been met before this. That's the whole point of commercial success, right? Again, I tend to agree with you, although I think you have to look at the facts of each particular case. When there are multi-feature products, like there are in this case, that is an important fact that has to be taken into account. That's why I've asked, as you said, multiple times about whether the comparisons are holding everything else constant. Right. And that simply is, first of all, TWW, every time they make this argument in their briefing, they don't cite to anything in the record to support it. It's pure attorney argument. It's in the blue brief and the gray brief. Every time they make this, no support. And that's because it's just not in the record, Your Honor. What is in the record is the board found that the nexus for commercial success was weak, and it was weak for several reasons. One, there was significant survey evidence, survey evidence that TWW itself injected into the PTAP proceedings, that showed all the different features that consumers value in these products over whether there's a built-in pump. In fact, as Dr. Stevick testified, whether the consumer just gets a pump in the box was valued over whether there's a built-in pump. TWW ignores every aspect of that evidence on this appeal. It just simply ignores it. It never addresses or explains how the board's decisions analyzing all the facts in those surveys was wrong. It never addresses what its own experts said. It never even acknowledges that Judge Robinson herself in the arbitration reached the exact same conclusion that this PTAP panel found by weighing the exact same survey evidence and the exact same testimony, that it's non-patented features that are what drive consumer demand for these products. And the arbitration decision attaching value, as I think Mr. Harkin has said, that that was one that by a proper regression analysis or whatever, isolates the value of the feature. Is that right or wrong? That's not in the record either. But the page of the arbitration is in the record. Yes, she reached the royalty. That was far less than what TWW was requesting. But there's no evidence of a regression analysis that held all features constant anywhere in this record. In fact, that argument wasn't made in the district court case below or in the IPR proceedings. I would like to address your honors questions on coextensiveness as well. As you're aware, we argued before the board that there is no coextensiveness here. We disagree with the board's findings on that. But as you noted, the board still nevertheless went through and did an additional, what I think of as an additional nexus analysis. And petitioners significantly rebutted that analysis with evidence and also pointing out how TWW's scarce arguments and evidence didn't actually support what they were saying, which the board considered all of that, weighed it, and that those findings should be affirmed. There is some discussion today from Mr. Harkins about an e-mail, a single maybe two-page e-mail, 9888, I believe it is, in the record. We addressed this in our brief at a red brief 41, I believe. Let me just confirm that. What did you say about it? Well, first and foremost, that was never cited to the board. You won't find that e-mail. But somehow or other, it's in the record. It was incorporated by reference, potentially. It was cited by experts, expert declarants from TWW, and those paragraphs were cited in the patent owner response. But TWW tried to criticize the board for not taking this into consideration when TWW never squarely put it in front of the board. There was also competing evidence on this. What do you make of that, of the content? This is the one about people going into Walmart or some store to the aisle without the pumps. They get very disappointed. I mean, without the built-in pumps. They get very disappointed, and they walk out the store. And then if you actually put them close to each other, they see the ones with the pumps, and a whole lot of them buy. That was the gist of that e-mail? That was the gist of that e-mail, and that was the head of sales talking to one of his biggest customers, trying to make sales. And there are lots of reasons. As he actually explained in his own declaration, which is unfortunately not part of this appendix, why the spin TWW is trying to put on that e-mail was wrong. And his declaration and his testimony was also in front of the board. So to the extent that TWW is arguing that by citing it in an expert report and then citing the expert report to the board means it was considered by the board, then the same thing is true of the competing evidence. And now we're back to a substantial evidence standard on this particular e-mail. And more directly to your question, Judge, there can be lots of different reasons why consumers walk in or walk out with or without a product. Maybe they didn't look in the right shelf. Maybe it was a time of year when stock was low. Maybe there was a sale going on, and so something sold more than another. That evidence just simply doesn't exist in this case, and I don't think it was properly presented in front of the board, certainly not in a way to criticize the board for not considering it, which is another common theme with TWW's appeal here. I think I counted almost 30 times where TWW argued that the board ignored evidence. But not one of those arguments is ever a citation back to where in the record the board ignored evidence. The board's analysis was thorough. TWW had a very short argument on nexus. It had a very short argument on commercial success. It had a very short argument on every single secondary consideration that it addresses on this appeal. And if you compare TWW's patent owner response arguments to the board's final written decision, you will see that they walked through the evidence meticulously. They didn't ignore anything. So there's therefore no error committed by the PTAP here, and all of their findings should be affirmed because they're supported by substantial evidence. Anything further? Just one, or I guess two more things, Your Honor. One, there was a reference to the market share issue. The board's opinion directly says market share is not required. So we've been a little confused by that all along, but what the board did say and what they did correctly do is they cited several cases from this court that say if you want a stronger showing of secondary considerations, it's better to provide sales and market share to show how it affected the overall market. They never said market share is required, market share evidence is required. They just said, well, you, TWW, made the argument that these sales represent a significant portion of the market. However, you didn't provide market share data, so therefore that detracts from your argument. On the Volvo case, Your Honors, this case just came out about a month ago. And an important point, there are a couple of important points, I think, from that case. First, this court noted that although phrases like some weight when used by a P-TEB finding may not always be ambiguous, they were particularly ambiguous in that case. Judge Dyke, you're right, this argument was not raised, but because we addressed it here today, I'd like to explain why in that case this was an issue. And in that case it was an issue, we don't have the same facts here. So, for example, in that case the board found significant evidence of copying, and the board said there's no evidence to detract from that copying, but then they said it's still copying at some weight. Then they made the same finding on commercial success. Commercial success, no evidence to detract from it, still entitled to some weight. On an industry praise, they said, here the evidence showed that the praise is actually tied to unclaimed features, much like our case, but they still gave it some weight. So this court said, well, that's ambiguous. How are you saying it's the same weight, even though you've already acknowledged that for some of these there's no evidence to contradict what you're saying, and for others there is evidence to contradict what you're saying. We don't have those facts here. The board considered all of the evidence, the evidence that TWW presented and the rebuttal evidence from petitioners. And for that reason I would submit Volvo is readily distinguishable from this case to the extent your honors want to consider it. Unless you have any questions for me. Thank you, counsel. Thank you. Mr. Hoffman has two minutes. Thank you, honors. So our issue with market share was that while they cited the right law, they concluded that it was weak evidence when there was a lot of evidence of raw value associated with the patent itself and a huge amount of sales, and that under precedent is sufficient. You don't need to say it's little value because of that. The Panduit case that I cited didn't have a market share, and they said it was one of the strongest cases they've ever seen. As to us raising this concept of not giving holistic analysis for the first time, actually you should find it in the yellow brief that we filed at page 14. For that purpose we cited, because there was no Volvo Penta case at that time, the In Re Pia Secchi case where they talked about looking at individual components of secondary considerations to knock down ability, and that that was reversible error, that you needed to look at this as a holistic matter. We also cite the Urand case for the proposition that it's not appropriate to put the burden of persuasion on the patent owner to show that there's obviousness with secondary considerations. That is, you are invalid unless you can prove otherwise. It's never the patent owner's burden to prove that. This is always an analysis where you're supposed to do a holistic analysis, and there was a reversal for that very reason, and in Volvo it was reversed for the same reason. The burden of production with respect to secondary considerations is on the patentee. That's true. So you had to bring up whatever was relevant. Had we failed to produce evidence, that's one thing. If we produce evidence and it's being assessed like you are invalid unless you persuade us that you're valid, then that's where the error lies, and that's what we think happened here. As to this concept of the email, it was in the record. It was actually quoted verbatim at length at Appendix 78, 79, and 78, 80, and it talks about doing a side-by-side comparison where you go to the store, and this is Intex itself going to Walmart and saying that's what consumers do. They go look for the same bed, built-in pump and non-built-in pump, and if they don't find the built-in pump... Appendix 78, 79, and 78, 80 is the quote about where Intex's seller for Walmart was doing this analysis and saying when you go in there, you're looking side-by-side on the shelves for these beds together, and if consumers don't find the built-in pump, they'll leave. They won't buy anything. They'll go find it somewhere else. Thank you.